John M. Princell, Appellee, v. Pickwick Greyhound Lines, Inc., Appellant.

Gen. No. 34,598.

Opinion filed June 26, 1931.

Moses, Kennedy, Stein & Bachrach, for appellant;
Walter Bachrach and Herbert H. Kennedy, of counsel.

Joseph D. Ryan, for appellee.

Mr. Justice Scanlan delivered the opinion of the
court.
John M. Princell, plaintiff, sued Pickwick Grey-
hound Lines, Inc., a Corporation, et al., in an action
on the case. In a trial before the court, with a jury,
there was a verdict returned finding the defendant
Pickwick Greyhound Lines, Inc., a corporation, guilty
and assessing the plaintiff's damages at the sum of
$100,000. At the conclusion of the arguments for a
new trial, the trial court "ruled that in event the plain-
tiff would agree to remit the sum of $25,000.00 upon
said verdict the court would overrule said motion for
a new trial, but that upon the refusal of said plaintiff
to agree to remit said $25,000.00 upon said verdict the
court would grant a new trial in said cause." There-
upon the plaintiff remitted the sum of $25,000 and

judgment was entered against the Pickwick Greyhound Lines, Inc., a corporation, in the sum of $75,000. This appeal followed.

The action was commenced against six defendants: (1) Motor Transit Management Company, a corporation; (2) Greyhound Lines, Inc., a corporation; (3) The Greyhound Corporation, a corporation; (4) Motor Transit Corporation, a corporation; (5) Pickwick Greyhound Lines, Inc. of Illinois, a corporation, and (6) Pickwick Greyhound Lines, Inc., a corporation, doing business as Pickwick Greyhound Lines and Greyhound Lines. At the conclusion of the plaintiff's evidence all of the defendants save Pickwick Greyhound Lines, Inc., a corporation, doing business as Pickwick Greyhound Lines and Greyhound Lines, and Greyhound Lines, Inc., a corporation, were, on plaintiff's motion, dismissed from the case. Following the reading of the court's instructions to the jury, but before the jury retired from the bar, the plaintiff dismissed from the case Greyhound Lines, Inc., a corporation. The six defendants named in the declaration were represented by the same counsel.

The plaintiff's declaration consists of three counts. Each alleges that on August 10, 1929, the defendants and each of them owned, possessed, operated and maintained a motor bus transportation system which extended through and between divers states of the United States, and in and between the city of Omaha, Nebraska, and the city of Kansas City, Missouri, and owned, managed, operated and maintained as part of said transportation system, as common carriers of passengers for hire and reward, divers motor vehicles known as motor busses; that that date the plaintiff was received and accepted by the said defendants and each of them as a passenger for hire and reward. The first count charges negligence generally in the management and operation of the motor bus in which the

plaintiff was riding as a passenger. The second count charges that the bus was operated at a high, dangerous and excessive speed, at the rate of, to wit, 60 miles an hour. The third count charges that in, upon and along the highway over which the bus was being operated were divers ruts, holes and depressions, which were likely and liable to cause the said bus to jar, jolt and sway with unusual and unnecessary force and violence in the event the bus was driven and operated upon and along the highway at a high or excessive rate of speed, all of which facts the defendants and each of them knew, or would have known had they exercised the highest degree of care consistent with the practical prosecution of their business to carry the plaintiff safely; that the bus was carelessly and negligently operated and driven over the said defective highway at a high, dangerous and excessive speed, at the rate of, to wit, 60 miles an hour. Each count alleges that the plaintiff was at all times in the exercise of ordinary care for his own safety. The defendant Pickwick Greyhound Lines, Inc., a corporation, appellant, filed the plea of general issue and a special plea of non-ownership and operation; also a special plea, which states that "before the 19th day of July, 1928, this defendant was known and doing business under the name of the Greyhound Lines, Inc., a corporation; that on the 19th day of July, 1928, the name of said corporation was changed to the Pickwick Greyhound Lines, Inc., a corporation."

The plaintiff's evidence tends to prove (*inter alia*) the following: On August 10, 1929, the plaintiff, then 46 years of age, entered the appellant's bus depot in Omaha, Nebraska, purchased a ticket to Kansas City, Missouri, boarded a bus and presented his ticket to the bus driver. The driver tore a coupon from the ticket and gave the coupon to the plaintiff as a receipt. After the accident the driver also returned the ticket to the

plaintiff. When the plaintiff entered the bus he was smoking, and the driver informed him that if he wished to smoke he should take a rear seat, which the plaintiff did. It was the first time the plaintiff had used this bus line and he was not familiar with the highways between Omaha and Kansas City. At the time of the accident and shortly before it, the bus was descending a grade and traveling at an estimated speed of 50 miles an hour. Plaintiff was the sole passenger on the rear seat, which extended across the entire back of the bus. There were other passengers, men, women and children, seated ahead of him. There were rough spots in the roadway and when the wheels of the bus struck them the bus jolted and "bounced" in such a manner as to cause the plaintiff to "bounce" off the seat about six inches. Other passengers were "bounced" and the plaintiff and one other passenger shouted loudly to the driver to stop, but he did not check or diminish the speed of the bus. The bus then hit a "big bump" and the plaintiff was thrown from the seat. His head hit the ceiling of the bus and he fell, or was thrown, back on the seat against something hard, the cushions of the seat having been dislodged by the violent jolting of the bus. The passengers then shouted to the driver to stop, and after the bus had proceeded about a quarter of a mile from the place of the accident it came to a stop. That the plaintiff was very seriously injured in the accident is not questioned, but we shall later refer to this branch of the case. In his closing argument to the jury, counsel for the appellant made the following statement: "Now, there isn't any real conflict in the evidence. I agree with my distinguished adversary. The only place where there is a conflict is on the speed of that bus. He swears it was fifty miles an hour. Why? To get a verdict, of course; but the overwhelming weight of the evidence is that it was not over thirty-

five miles an hour. There isn't any other substantial conflict in the evidence."

The appellant contends that the burden of proving that it owned, operated or controlled the motor bus, rested upon the plaintiff; that the liability of the appellant, if any, should have been determined upon the evidence as it stood at the close of the plaintiff's case and that the plaintiff, at the conclusion of his evidence, had not established the material averment in his declaration "that this defendant (appellant) 'owned, possessed, operated and maintained' the motor bus in question"; that the appellant, when its motion for a peremptory instruction was overruled by the court, at the conclusion of the plaintiff's evidence, "then elected to stand by its motion, notifying the court that it would take no further part in this case. . . . The liability, if any, of the defendant should then be determined upon the evidence as it stood at the close of the plaintiff's case"; and "that by allowing the jury, in arriving at their verdict, to consider all the evidence given by these witnesses for the Greyhound Lines, Inc., a corporation, the jury were permitted to assume that the defendant Pickwick Greyhound Lines, Inc., a corporation, was responsible for their testimony and vouched for their credibility." In considering this contention it is necessary to keep in mind the fact that the same counsel represented all of the defendants named in the declaration. The defendant Greyhound Lines, Inc., called as a witness Clifford Leabo, the driver of the bus. Counsel for the defendants, upon the direct examination, carefully avoided asking this witness any questions that would tend to bring out the name of the company for which he was working on the day in question, but on cross-examination the witness testified that he was working for the Pickwick Greyhound Lines at the time of the accident. Appellant seeks to avoid the effect of this evidence by the instant

contention. At the conclusion of the plaintiff's evidence the appellant made a motion for a directed verdict in its favor and when the court overruled this motion its counsel then stated that it would stand upon its motion for a directed verdict and *that it would take no further part in the trial of the cause,* and assuming that this position was taken in good faith, nevertheless, it is clear that it was afterwards abandoned, or, at least, not maintained. Counsel for the defendants had the record show that he called certain witnesses on behalf of the Greyhound Lines, Inc., but it is plain that the testimony of these witnesses tended to rebut that offered by the plaintiff which applied directly to the appellant. While the record shows that the closing argument was made "for defendant," nevertheless, it plainly appears from a reading of the same that it was intended to aid the appellant. Nowhere in it was the name of either defendant mentioned. Counsel refers to "the bus" and "the common carrier." At one place in the argument counsel did state: "If *they* are liable at all *they* are liable because he (referring to the driver) was liable." At the time the instructions offered by the counsel for the defendants were tendered to the court there were two defendants still in the case, the appellant and Greyhound Lines, Inc., and all of the offered instructions were carefully drafted, by able counsel, to apply to both of these defendants, and many of them directed the jury to consider all of the evidence introduced upon the trial of the cause in determining the liability of the defendants. As bearing upon this point we will cite a few of the defendants' given instructions:

"22. The court further instructs you that if the accident in question was unavoidable, so far as the defendants were concerned, then no liability is incurred by them, whether as a result of it said John M. Princell was injured; and if in this case the jury believe

*from all of the evidence* and under the instructions of the court that, so far as the defendants were concerned, the injury to said John M. Princell was unavoidable, then the jury should find the defendants not guilty.

"15. The jury are instructed that the plaintiff cannot recover at all in this case against the defendants unless the jury believe the plaintiff has proved by a preponderance of the evidence the following propositions:

"First: That the plaintiff was exercising ordinary care for his own safety at and just prior to the time of the accident in question.

"Second: That the defendants were guilty of negligence in the manner charged.

"Third: That such negligence, if any, was the proximate, direct cause of said accident and the plaintiff's injuries, if any, and if you find from the evidence that the plaintiff has failed so to prove these propositions as stated or if he has failed to prove any one of them, or if you find from the evidence that the evidence is evenly balanced so that you are in doubt and unable to say on which side is the preponderance as to any one of these propositions, or if the evidence preponderates in favor of the defendants as to any one of these propositions, then the plaintiff cannot recover against the defendants and you should find the defendants not guilty.

"10. The Court instructs you that the defendants were not insurers of the absolute safety of their passengers; and in this case if the jury believe from the evidence that the injuries to the plaintiff, if any, were caused by running into a defect in the road which, under the facts and circumstances surrounding said accident, could not have been guarded against by the exercise of sound judgment and by the most vigilant foresight and care on the part of said defendants, then

you are instructed that you should find the defendants herein not guilty.

"9. The Court instructs the jury that one of the defenses relied upon in this case is that of contributory negligence. . . . If the jury believe from the evidence under the law as stated under the instructions of the court, that said John M. Princell was guilty of contributory negligence, as herein defined, immediately prior to and at the time of the accident in question, then the verdict of the jury must be for the defendants.

"16. The jury are instructed that the plaintiff is required by law to establish his case by a preponderance of the evidence before he can recover. If the plaintiff in this suit has not so established his case, or if the evidence is evenly balanced so that the jury are in doubt or unable to say on which side is the preponderance, or if the preponderance of the evidence is in favor of the defendants, then in either of these cases the verdict should be not guilty.

"20. If the jury believe from the evidence that without any fault or negligence of the defendants the plaintiff accidentally fell from the rear seat of said motor bus to the floor thereof, even though such accident occurred without any negligence on the part of the plaintiff, then you should find the defendants not guilty.

"21. The court instructs you that a carrier of passengers is not an insurer of their safety and for a mere accident unmixed with negligence on the part of the carrier directly contributing thereto, no action will lie, even though injury has been done, and if the jury shall find from the evidence that there was no negligence on the part of the defendants, its agents and employees, directly contributing to cause the plaintiff's injuries, if any, then you should find the defendants not guilty."

In view of the record it is idle for the appellant to argue that it took no part in the trial after the court overruled its motion for a directed verdict at the close of the plaintiff's case. As the appellant did not stand upon its motion, it is precluded from asserting that the jury were not warranted in considering, as to it, all of the evidence in the case. (See *Jennings v. Baltimore & Ohio R. Co.,* 195 Ill. App. 543; *Postal Telegraph-Cable Co. v. Likes,* 225 Ill. 249, 264.) However, the plaintiff, before resting his case, proved that the motor bus in question was operated and controlled by the appellant, and the trial court properly refused to then direct a verdict in its favor. The accident happened August 10, 1929. The appellant pleaded, specially, that prior to July 19, 1928, it was known and doing business under the name and style "Greyhound Lines, Inc., a corporation," but that on said date it changed its name to "Pickwick Greyhound Lines, Inc., a corporation." It was not necessary for the plaintiff to prove the facts admitted by this plea. The plaintiff proved that he purchased the ticket at the bus station in Omaha; that the ticket bore upon its face, in large letters, the words "Issued by Pickwick Greyhound Lines," and that the ticket was accepted by the driver of the bus. It seems clear from this evidence, especially in view of the special plea, that the plaintiff proved, prima facie, the appellant's ownership and operation of the bus in question. The appellant, *in this court,* contends that a close examination of the ticket will reveal that it was issued by "Motor Transit Management Company," and not by the appellant, and argues that "the proper defendant to bear the burden of the claim was the Motor Transit Management Company, a corporation and that a judgment has been rendered against the wrong defendant." The words "Motor Transit Management Company" on the ticket are not discernible to anyone possessing only normal

vision. After looking at the ticket carefully, one could only read that it was "Issued by Pickwick Greyhound Lines." These last quoted words are printed in large, plain type that stands out prominently upon the face of the ticket. The word "Pickwick" appears at the top of the ticket. Just below this word appears the word "Greyhound," and just below that word appears the word "Lines." Acting upon the suggestion of counsel for the appellant, we find that by the aid of a powerful magnifying glass we are able to read between the word "Greyhound" and the word "Lines," the words "Motor Transit Management Company." The smallest regular size of printing type is brilliant. This size can be read by one possessing excellent vision. The letters in the words "Motor Transit Management Company" appear to be about one-third the size of brilliant type. The words in question are printed in such exceedingly small type and are so artfully placed that they appear to the eye, without the aid of a magnifying glass, as a mere black line. Counsel for the plaintiff asserts that the record shows that these words were never called to the attention of the trial court, the jury or the counsel for the plaintiff. After a careful reading of the record we find that this assertion is fully warranted. The same counsel represented all of the defendants, and if he knew of the hidden words, he did not in any way call attention to them during the trial. The plaintiff is fully warranted in the argument that "the obvious purpose of the defendant in printing the unreadable name of the other company on the ticket, and in concealing it between the words comprising defendant's corporate name, was to deceive the public and to enable it to shift responsibility in the event of injury to its passengers." A common carrier must be honest and fair in its dealings with the public. If the Motor Transit Management Company operated and con-

trolled the bus, why was its name concealed upon the ticket? If the appellant, in the trial court, intended to rely upon the defense it now seeks to interpose in this court by the instant contention, why was it not made in the trial court? The appellant offered no evidence as to the ownership and control of the bus and it made no request for instructions bearing upon that subject, and the point was not even argued to the jury by its counsel. This counsel stated to the jury: "Therefore I say to you gentlemen, there is only one thing for you to do, consider this from the standpoint of the practical operation of the bus, and in the practical operation of that bus was that man carried with the proper degree of care?" Moreover, certain instructions given on behalf of the two defendants, appellant and Greyhound Lines, Inc., are based upon the assumption that these defendants were in charge and control of the bus and that the plaintiff was a passenger. A passenger, when he purchases a ticket from a common carrier, is not bound by words upon it that cannot be read without the aid of a powerful magnifying glass. We must assume from the record in this case that during the trial of the cause counsel for the appellant had no knowledge of the presence upon the ticket of the words in question. To assume otherwise would amount to charging the counsel for appellant with practicing bad faith towards the court, the jury and plaintiff during the trial of the case. The appellant, therefore, having tried the case upon the theory of fact that there were no such words upon the ticket, should not be allowed to assume a different attitude in this court. But even if the words "Motor Transit Management Company" must be considered, in the instant case, as a part of the ticket in question and binding upon the plaintiff, nevertheless, the ticket would still constitute prima facie proof that the "Pickwick Greyhound Lines" and the "Motor Transit Man-

agement Company'' issued and sold the ticket and had charge and control of the bus. In its brief *the appellant asserts that it is a Delaware corporation,* and it makes a rather strained argument to the effect that if the words ''Pickwick Greyhound Lines'' are referable to any of the defendants sued, they are at least as equally referable to the Pickwick Greyhound Lines, Inc., of Illinois, a corporation, as to the appellant, and that as the plaintiff dismissed, at the conclusion of its case, Pickwick Greyhound Lines, Inc., of Illinois, a corporation, it would be mere guesswork to draw the inference that the words ''Pickwick Greyhound Lines'' that appear on the ticket are referable to the appellant, instead of Pickwick Greyhound Lines, Inc., of Illinois, a corporation. In response to the instant contention the plaintiff, in his brief, called attention to the fact that there was no evidence in the record to sustain the assertion of the appellant that it is a Delaware corporation. After the brief of the appellee was filed, the appellant then saw fit to file in this court a photostatic copy of the appeal bond in the case, and in its reply brief it calls our attention to the seal affixed to the signature of the appellant upon the bond. The seal purports to be that of a Delaware corporation, and appellant argues that because of this seal we must hold, as a matter of fact, that the appellant is a Delaware corporation. This argument is, of course, without merit and it is but another indication of the determination of the appellant to inject into the record alleged facts that were not brought out in the trial court. The Pickwick Greyhound Lines, Inc., of Illinois, was voluntarily dismissed from the case by the plaintiff at the conclusion of his evidence, and the Pickwick Greyhound Lines, Inc., a corporation, described in plaintiff's declaration as doing business as the Pickwick Greyhound Lines and Greyhound Lines, pleaded specially that it had been sued herein as Grey-

hound Lines, Inc. The plea further admits that the Greyhound Lines, Inc., had changed its name to Pickwick Greyhound Lines, Inc., a corporation, which is the name of appellant. It would appear, therefore, that the instant contention of appellant is answered by its own plea. As bearing upon the question of the proof offered by the plaintiff, we may add that it appears further from his evidence that after the accident and upon the arrival of the bus at Auburn, Nebraska, the bus driver called a doctor, who took charge of the plaintiff and had him removed to the Auburn Hospital; that after the plaintiff had remained in this hospital a week the doctor directed him to go to Kansas City, Missouri, to the headquarters of the bus company; that the plaintiff went there and while there certain representatives of the ''Pickwick Greyhound Lines'' called on him and its doctor examined him and took X-ray pictures of him; that lawyers of the ''Pickwick Greyhound Lines'' called on him; that Dr. Swift, representing the ''Pickwick Greyhound Lines,'' was present at the Wesley hospital, in Chicago, when Dr. Magnuson operated upon the plaintiff. Appellant offered no evidence upon the question of the control or ownership of the bus. Such evidence, of course, was in its possession and control. The same counsel represented all of the defendants and it was within his power to prove definitely the company or companies that owned and controlled the bus. He saw fit to offer no evidence upon the subject. It has been frequently held that where one party has evidence upon a point as to which the other party has made a prima facie case, but fails to present it, such failure may be taken as an admission that such evidence, if presented, would not aid the party who has it.

The appellant did not ask for a directed verdict at the close of all the evidence, and if we are correct in our holding that it did not stand upon its motion for a

directed verdict at the close of plaintiff's case and that it did take part in the further trial of the cause, then, of course, the statement of the witness Clifford Leabo that he was working for the "Pickwick Greyhound Lines" at the time of the accident was competent evidence tending to show that the appellant owned and operated the bus at the time of the accident.

The appellant contends: (1) "The trial court erred in admitting in evidence over the objection and exception of the defendant, Pickwick Greyhound Lines, Inc., a corporation, Plaintiff's Exhibit Number 10, being the February, 1930 issue of 'The Greyhound Traveler' "; (2) "The trial court erred in admitting in evidence over the objection and exception of the defendant, Pickwick Greyhound Lines, Inc., a corporation, Plaintiff's Exhibit Number 11 purporting to be a time-table corrected to January 15, 1930 and necessarily issued subsequent to that date"; and (3) "The trial court erred in admitting in evidence over the objection and exception of the defendant, Pickwick Greyhound Lines, Inc., a corporation, Plaintiff's Exhibit Number 12, being a photostatic copy of a ticket alleged to have been purchased by the witness, Vernon Thompson in the spring of 1930." We have carefully considered the argument of the appellant in support of these three contentions and we find no merit in it.

The appellant contends that the trial court erred in giving to the jury plaintiff's instruction number 23. This instruction reads as follows:

"23. You are instructed that it is the duty of a common carrier to do all that human care, vigilance and foresight can reasonably do, under the circumstances and in view of the character and the mode of conveyance adopted, consistent with the practical prosecution of its business, reasonably to guard against accidents and consequential injuries, and if it neglects so to do it is to be held strictly responsible

for all consequences which directly flow from such neglect, (provided such neglect and consequences is alleged in the declaration and is established by a preponderance or greater weight of the evidence); that while the carrier is not an insurer of the absolute safety of the passenger, it does, however, in legal contemplation, undertake to exercise the highest degree of care to secure the safety of the passenger and is responsible for the slightest neglect resulting in injury to the passenger (provided such neglect and injury is alleged in the declaration and is established by a preponderance or greater weight of the evidence), if the passenger is at the time of the injury exercising ordinary care for his own safety."

The appellant argues that the instruction "stated to the jury two inconsistent rules of law defining the duty of a common carrier of passengers. *The first half of the instruction defined that duty correctly*. The second half of the instruction defined the same duty erroneously." The appellant cites in support of this contention certain cases which announce the rule that an erroneous instruction cannot be said to be cured by a proper instruction on the other side when from the evidence it is impossible to say that the jury did not follow the erroneous one. It will be noted that the instruction in question is contained in a single paragraph. The argument of the appellant amounts to no more than this, that the words, "in view of the character and the mode of conveyance adopted, consistent with the practical prosecution of its business," used in the first part of the paragraph, should have been repeated in the second part of the paragraph. In his argument to the jury counsel for the plaintiff stated that it "was the duty of the defendant to exercise the highest degree of care *consistent with the practical prosecution of the business* to carry him safely." Counsel for the appellant, in his argument, stated to

the jury: "Now, there cannot be any recovery in this case, gentlemen, as the Court will instruct you, unless there is a failure on the part of the bus line to exercise a degree of care, a high degree of care, too, *consistent with the practical operation of its business.* A common carrier is not an insurer of its passengers' safety. It does not give a guaranty policy to everybody that buys a ticket that they won't be hurt. A common carrier has to operate its bus and has to give service to the public as the law requires it to do; it has to operate its busses so as to keep up according to the schedules or times fixed by the laws and regulations of the states, and has to go from place to place as required by schedule." Counsel for the appellant further stated in his argument: "Therefore I say to you gentlemen, there is only one thing for you to do, consider this from the standpoint of the practical operation of that bus, and in the practical operation of that bus was that man carried with the proper degree of care?" The instant contention, in our judgment, is without substantial merit, as the jury could not have been misled by the instruction. Moreover, the defendants' given instruction number 10 imposed upon the defendants the duty of exercising a higher degree of care than does the instruction in question. Instruction number 10 contains no qualification respecting the character and the mode of conveyance adopted and the practical operation of the defendants' business, and by it the jury were authorized to find the defendants guilty unless the accident "could not have been guarded against by the exercise of sound judgment and by the most vigilant foresight and care on the part of said defendants." In its reply brief the appellant seeks to evade the effect of this instruction by claiming that it was offered by the defendant Greyhound Lines, Inc., and not by the appellant, and that therefore, under the rule laid down in *Garvey v. Chicago Rys. Co.,* 339 Ill. 276,

the appellant may assign error on an instruction offered by a codefendant. It is a sufficient answer to this contention to say that instruction number 10 clearly applies to both defendants and by it the jury were instructed to find both defendants not guilty if they found from the evidence certain facts.

During the cross-examination, by the attorney for the plaintiff, of Eimer Castberg, a witness called by the defendant Greyhound Lines, Inc., the following occurred: "Mr. Ryan (counsel for the plaintiff): Q. You never told counsel about this jerk, or you never talked to anybody about your testimony? A. No. Q. Don't you know you aren't telling the truth? Mr. Bachrach: I object to that. The Court: Oh yes. Mr. Ryan: I withdraw that. The Court: Not only that but you apologize. Mr. Ryan: All right, I apologize." The appellant contends that "notwithstanding the apology of counsel and the ruling of the trial court, the jury had heard what was in effect the unsworn testimony of counsel for plaintiff. The reflection upon the witness *and the party producing him* was irretrievably cast. The damage had been done and the ruling of the court could not eradicate from the minds of the jury its prejudicial effect." The appellant has strenuously insisted that it stood upon its motion for a directed verdict at the conclusion of the plaintiff's case. We will quote one of its statements in its brief upon this subject: "The trial court then overruled the motion of the defendant Pickwick Greyhound Lines, Inc., a corporation, for an instructed verdict in its favor; and the Pickwick Greyhound Lines, Inc., a corporation, thereupon elected to stand upon its motion for an instructed verdict and notified the court that it would take no further part in the trial of the case. Thereafter it neither introduced evidence nor tendered instructions. The defense of the case was undertaken solely by the Greyhound Lines, Inc., a

corporation, and all of the evidence introduced by way of defense was in behalf of this corporation.'' The appellant, to be consistent, should therefore concede that the objection of Mr. Bachrach to the question complained of was made on behalf of Greyhound Lines, Inc., alone, and it would then follow that the appellant is in no position to raise the instant contention. However, in order to make the instant contention, the appellant is forced to take the position that it produced the witness Castberg. It cannot take one position in the trial court and an entirely different one in this court, nor can it take contradictory positions in this court. Even if the appellant had the right to raise the instant contention, we would hold that it possesses no substantial merit, as the trial court by his stern attitude towards the plaintiff's counsel prevented any possible harm to the appellant.

The appellant contends that the counsel for the plaintiff made a number of prejudicial statements to the jury in his opening and closing arguments to the jury. We have read both arguments and we find but one objection made during the two arguments. During the closing argument of counsel for the appellant he stated to the jury that the appellant had not wasted a minute's time in the examination of the doctors called by the plaintiff because it was not contesting the claim that the man was hurt. During the closing argument of Mr. Ryan the following occurred: ''Yet Mr. Bachrach says, 'We let you show that without objection.' But did he? Did you hear the struggle we had to get in the x-ray films that the Roentgenologist Doctor Blaine, at Wesley Hospital took, on some technical objection that he did not pull the switch. Mr. Bachrach: I object to that. The Court: He may make the argument.'' As the appellant contends that it took no part in the proceedings after its motion for a directed verdict had been denied, it must be pre-

sumed that the objection made to the statement of Mr. Ryan was made solely on behalf of the defendant Greyhound Lines, Inc., and therefore the appellant is in no position to raise the instant contention. However, we are not disposed to hold that the statement was an improper one. Counsel for the appellant, by his argument, sought to convey the impression that the appellant had not contested in any way the claim of the plaintiff as to his injuries, and the counsel for the plaintiff had a right to show that this argument was not warranted by the record.

The appellant contends that ''the verdict is so flagrantly excessive that it can be accounted for only on the grounds of passion and prejudice. A remittitur will not remove this passion and prejudice.'' The plaintiff's evidence as to his injuries, pain and suffering was not rebutted in any way by the appellant. After the accident the bus proceeded to Auburn, Nebraska, and there the driver called Dr. Andrews, who took charge of the plaintiff and had him removed to the Auburn Hospital. While there his back was ''plastered'' with adhesive tape and he was given narcotics. He was suffering such severe pain that the doctor advised him to go to Kansas City, Missouri, the headquarters of the bus company. When the plaintiff arrived at the latter place ''representatives of the Pickwick Greyhound Lines'' talked with him. One of these representatives, Dr. Nesselrode, examined him and took X-ray pictures of his back. Although the plaintiff was constantly kept under the influence of narcotics he suffered intense pain and his condition was steadily becoming worse. The muscles of his legs twitched and he could barely walk. Dr. Nesselrode told him he ''had a broken back, or fracture of the first lumbar vertebrae,'' and that he was in a dangerous condition, and he advised the plaintiff to go to Chicago and see Dr. Magnuson. An ambulance was

then called and the plaintiff was taken to the railroad station. He entered Wesley Hospital, in Chicago, on August 20, 1928, at which time he was having spasms and convulsions and was unable to walk. A number of doctors, including Dr. Magnuson, examined him. X-ray pictures were taken and he was put to bed and placed on a stiff canvas stretcher, in a Buck's extension, with toe weights on his feet. He remained in this position for three weeks, during all of which time he suffered intense pain and was given morphine, codeine, luminol and allonal. He lost control of his bowels, due to ''an irritation to the nerve supply of the bowel which caused a spasm of the bowel and it was extremely difficult to cause the bowels to empty themselves because of their irritated condition, their rigid condition.'' On September 10 he was given a general anesthetic and operated upon by Dr. Magnuson. X-ray pictures disclosed that the plaintiff had sustained ''a compression fracture of the first lumbar vertebra''; that ''the top of the sacrum which normally is at an angle of approximately from thirty to forty-five degrees, here is practically vertical, it is facing forward, showing that there is an accentuation of the normal curve of the back, much exaggerated and on that account the fifth lumbar, which should have a resting place on it, is literally suspended in air because this surface which now is vertical should be this way, so that the bone above it could rest on it. This sacrum is turned this way so that this bone is almost as though it had nothing to rest on, but of course there are ligaments and other supporting structures that do keep it from sliding entirely out of position.'' X-ray pictures taken on November 11 showed that in the operation by Dr. Magnuson an inlay of bone had been fastened to the spinous processes of six vertebrae for the purpose of splinting or supporting the collapsed vertebra. In the operation Dr. Magnuson made an

incision in the spine between the mid-dorsal region and the lower lumbar region, separated the muscles from their attachment to the spine, cut seven inches of bone out of the tibia, the large bone between the knee and the ankle, and fitted it into the spine and then fastened it there. This bone from the tibia, three-fourths inch in width and three-eighths inch in depth, was grafted to the spine to prevent further deformity and to immobilize and fix the spine so that the constant strain of the forward bending would not produce pain and further atrophy of the bone. The bone graft, which was described as like welding several links of a chain together, resulted in a stiffening of the vertebrae. The plaintiff's condition, following the operation, was so serious that the physicians were obliged to give him a blood transfusion. Since the operation he has been obliged to wear a Taylor brace, which is a steel brace going around the hips, up the back and around the shoulders and chest, and he cannot walk without this brace. When he was able to get up after the operation, he suffered "tremendous pain" in the lower part of his back when he stood up. X-ray pictures of his back were then taken and several doctors, including Dr. Magnuson and Dr. Swift, *the latter representing the Pickwick Greyhound Lines,* held a conference to determine the advisability of another operation. While the plaintiff agreed to submit to another operation, the doctors concluded that he would in all probability not survive such an operation; that even if it were possible to perform a second operation successfully it would be necessary, in order to correct the condition that existed in the lumbo-sacral joint, to fasten these two bones together in a way that would not permit any strain to fall on the ligaments; that as a result of the first operation the plaintiff has six vertebrae immobilized, and that even if a second operation could be performed successfully it would result in a stiffen-

ing of his entire back. After the operation of September 10, the plaintiff was in a state of profound unconsciousness for a period of five days, and was semi-conscious for five days thereafter. He was required to lie on his back, without moving, for four weeks. He was in constant pain and it was necessary to give him morphine and other narcotics to produce sleep. Since he left the hospital he has been taking electrical treatments, massage and rest in bed, and he cannot walk across the room without the aid of a cane, as he is unable to control his legs and he loses his balance. He cannot walk at all without using the metal brace. At times he has muscle spasms which shoot down into his legs. When he walks or stands for any length of time he has great pain in the lower part of his back. After he remains seated a while he must then change his position to obtain relief. He is able to sleep only when he takes Paralgia tablets. A physician testified that the deformity in the lower part of the plaintiff's spine could not be corrected by an operation; that the deformity is such that it would require a separation of these vertebrae in order to place them in a normal position, but that this operation would entail such a degree of surgical shock and cause such damage to the tissues and spinal nerves that the plaintiff would not be able to survive it; that even if the operation were successful and the plaintiff survived, his back would then be as "rigid as a poker" from his hips to his shoulders, and the function of his legs would not be restored. For seven or eight years prior to the accident the plaintiff was employed by a realty company and earned $800 per month. Three months prior to the accident he entered the services of a finance corporation, because he believed there were better prospects for him in this new employment. He was selected to fill this position from a group of 15 or 20 competitors. In this employment he earned $110

per week. At the time of the trial his hospital, nurses' and doctors' bills were approximately $3,800. In his closing argument to the jury counsel for the appellant stated that "the man is hurt. *His need is great,*" but he further stated that he would not discuss the question of the injuries nor the amount that should be allowed the plaintiff in case the jury found for the latter. The record shows plainly that the appellant had it in its power to introduce evidence as to the plaintiff's injuries, but it did not see fit to do so. The undisputed evidence shows that the plaintiff is a physical wreck and that he will always remain such; that he will never be able to engage in any occupation and that he will suffer severe pains as long as he lives. We find nothing in this record to warrant us in holding that the verdict of the jury was grossly excessive or that it was the result of passion and prejudice. The trial court was of the opinion that the amount of the verdict, $100,000, was excessive and he compelled the plaintiff to enter a remittitur, and we would not be justified in holding that the amount of the judgment, $75,000, is excessive.

The appellant has had a fair trial and the judgment of the superior court of Cook county is a just one and it should be and it is affirmed.

*Affirmed.*

GRIDLEY, P. J., and KERNER, J., concur.