502

Louis McCusker, Appellee, v. Curtiss Wright Flying Service, Inc., Appellant.

Gen. No. 36,052.

504

Opinion filed February 21, 1933.

EUGENE P. KEALY, for appellant; EDWARD W. RAWLINS and FAY WARREN JOHNSON, of counsel.

C. C. CUNNINGHAM, for appellee; CHARLES L. MAHONY and CHESTER D. KERN, of counsel.

MR. PRESIDING JUSTICE SCANLAN delivered the opinion of the court.

Louise McCusker, plaintiff, sued Curtiss Wright Flying Service, Inc., a corporation, defendant, in case. A jury returned a verdict finding defendant guilty and assessing plaintiff's damages at $10,000. Judgment was entered on the verdict and defendant has appealed.

The declaration contains one count, which alleges that defendant was possessed of, using and operating certain airships or aeroplanes for the conveyance of passengers for hire; that, in Cook county, Illinois, plaintiff became a passenger in a certain airship or aeroplane used and operated by defendant, to be carried from said point to Valdosta, Georgia, for a re-

ward paid; "and thereupon, it then became and was the duty of defendant to use the highest degree of care reasonably consistent with the mode of conveyance and practical operation of said airship or aeroplane to carry the plaintiff safely from the said point at which the plaintiff became a passenger therein for reward, to wit: Glenview, . . . Illinois, to . . . Valdosta''; that while plaintiff, with all due care and diligence on her own behalf, was riding in said airship, defendant, by its servants in charge of said airship or aeroplane, so carelessly, negligently and improperly drove and managed the said airship or aeroplane . . . that by and through the negligent and improper conduct of defendant, the said airship or aeroplane ran into and struck with great force and violence upon and against a tree situated in Waynetown, Indiana, and thereby and in consequence of said collision the said airship or aeroplane fell and was precipitated to the ground and plaintiff was thrown against parts of said airship and to and upon the ground, and was then and thereby greatly bruised, hurt and wounded, and divers bones of her body were then and there broken and she became sick, sore, lame and disordered, and so remained for a long space of time, to the damage of plaintiff in the sum of $100,000. The sufficiency of the declaration was not challenged by demurrer or otherwise. Defendant filed the plea of the general issue.

Counsel inform us that this is the first case involving an airplane accident tried in this State, and that there have been only a few in other jurisdictions, especially in courts of record.

While plaintiff contends that the doctrine of *res ipsa loquitur* applies, she also contends that aside from that question, and regardless of whether or not defendant was a common carrier, she proved by facts and circumstances surrounding the accident that defendant's pilot ran into the tree in question by reason of his negligence in driving and managing the aeroplane.

Defendant thus states its theory: "That on the occasion in question plaintiff engaged defendant to undertake an air flight in the night time from Glenview Air Port, a point near Chicago, Illinois, to Valdosta, . . . Georgia; that defendant, for the purposes of such trip furnished plaintiff with a licensed plane and a competent licensed transport pilot; that prior to the takeoff, the ship was properly equipped, inspected and placed in good condition for the journey; and that in making said trip, the pilot followed one of the regular interstate air lanes out of Chicago, down through . . . Indiana southward, which had been marked out by the Federal Government (in charge of air traffic) with beacons and landing fields, including emergency landing fields, lighted by it for the aid of night flying. That after some three hours or more out of Chicago the pilot undertook to land at an emergency landing field at Waynetown, Indiana, which said field had, a short time previously, been laid out by the Government and which was under its control and management. That in attempting to make the landing, the pilot maneuvered his plane in the regular and approved manner for the making of night landings, and in approaching the entrance to the north and south runway on said landing field, was in the exercise of all due care, but notwithstanding, while his plane was approaching said runway in the proper pathway of descent, it collided with an unmarked tree *which was standing in the direct line of approach to the entrance* to the north and south runway upon which he was attempting to land, and this tree was of such height and at such distance from said runway, that it would strike a plane making a landing at the proper angle of descent. That said tree did not have any obstruction light on it but was wholly unmarked and there was no reason why the pilot should have suspected the presence of such tree and no way in which, by the

exercise of due care, he could have discovered same in the night time.'' (Italics ours.)

On May 22, 1930, plaintiff received a message that her mother had been fatally injured in an accident at Valdosta, Georgia, and requesting that she proceed there immediately and bring Dr. Harvey, the family physician. Plaintiff, who had seen folders and literature distributed by defendant, telephoned Mr. Russell, an employee of defendant, acquainting him with the situation and inquiring as to what arrangements could be made for the trip. Russell told her that a plane was at her disposal and the fare would be $672—double fare for night flying. Plaintiff and Dr. Harvey arrived at the Curtiss-Wright field at Glenview, Cook county, Illinois, between 10:15 and 10:20 p. m. daylight saving time, where the operation manager, Moore, told her that she was fortunate to have such a clear and wonderful night for the trip, and inquired if she had ever been in an airplane before, to which she replied, ''No,'' and he then said that she would have a very good pilot, Harold Mayer, and introduced the latter to her. Moore told plaintiff: ''You will make as far as Evansville tonight and stay there for dawn.'' The pilot told plaintiff that the first stop would be at that place, to refuel. The plane took off about 11 p. m. daylight saving time. Plaintiff testified: ''There was no conversation with the pilot at any time during the trip. The night was perfectly clear and the sky was studded with stars. It was a clear lovely night and I noticed no wind at all. . . . I dozed on Dr. Harvey's shoulder and the next thing I really have any conscious knowledge of, I was in the hospital . . . at Crawfordsville, Indiana.'' Moore testified that just prior to the flight ''there was an unlimited ceiling, clear, stars visible and with the wind from the south or southwest at about fifteen miles velocity. By unlimited ceiling, I mean there were not

510

any clouds that one could make out as far as one could see.'' Defendant's witness Cord testified that about the time of the accident "there was not much wind. Just an occasional blow.'' The plane, a licensed one, was of a type known as the "Challenger Robin,'' a monoplane. It carried two passengers and a pilot, had a fuel capacity of 50 gallons of gasoline, a high speed of 120 miles per hour, a cruising speed of 96 miles per hour, a landing speed of 45 miles per hour, and a cruising range of 514 miles. Moore gave the pilot the following written order:

"Fly lighted Interstate Route via Terre Haute, Evansville, Nashville, Chattanooga, Atlanta, Air line south to Valdosta. Wire arrival and all particulars. *Go thru as far as possible without stopping for sleep.* Weather clear all the way. Check weather all stops. *No flying under 500 feet.''* (Italics ours.)

Mayer was "a licensed transport pilot.'' The accident occurred about 1:20 a. m. central standard time, at the outskirts of Waynetown, Indiana, 130 miles south of Chicago. At the time, the pilot was approaching the emergency airport located near that place. Defendant states that the evidence does not show why he attempted to land there. It conjectures that "it may have been that he came down for rest, or to refuel, or because of local air conditions, or for many other causes.'' The jury were fully warranted in finding that air conditions did not bring about the attempt to land, and that it was not necessary to refuel at that place. In fact, it is undisputed that a pilot could not obtain gasoline nor oil at that airport. Moore testified that the airplane, when it left the Glenview airport, was "in perfect condition,'' and after the accident an examination showed that there was nothing wrong with the mechanism of the plane, and there is no evidence of engine or fire trouble. Moore testified that on the same day Mayer had been the pilot on a sightseeing trip, and Schroeder, base manager of defendant, testi-

fied that Mayer, on the same day, prior to the time he started on the instant trip, ''had done two hours and 28 minutes of flying.'' The gasoline tanks were full when the plane left Chicago, and this supply was considered sufficient to give the plane a cruising range of 514 miles. In June, 1929, the Department of Commerce laid out ''an emergency airport,'' close to the village of Waynetown, which was used only for emergency landings. Defendant concedes that ''the landing field was outside of the Village of Waynetown and the nearest house to it was the Monroe house, which was approximately two blocks from the airport.'' The landing field is within the airport and consists of two runways, *each 500 feet wide, one extending north and south a distance of 1,950 feet* and the other extending east and west a distance of 2,100 feet. At the northeast corner of the field was a steel tower, 43 or 53 feet in height, on the top of which was a beacon light of 1,000 candle power, which revolved. Around the boundaries of the field were numerous electric lights, some red and some white. The caretaker of the airport checked the lights about 12:15 a. m. and found them all lighted. It is somewhat difficult to enumerate with accuracy all of the lights used on the airport, but it is undisputed that the airport was well lighted, and the only point made by defendant as to lights is that the tree in question was unmarked by any warning light. Immediately prior to the accident, the plane, which was flying southward towards the airport, struck a tree, then the ground, and finally landed approximately 200 feet southeast of the tree. The pilot was instantly killed and plaintiff was seriously injured. The north *entrance* to the north and south runway was 100 feet wide, and the east and west ends of the same were marked by green lights placed on iron pipes four or five feet in height. On the north side of the airport, except at the entrance, was a wire fence four or five feet high, and along the same, according to plaintiff's

evidence, were a number of red lights placed on posts of about the same height. There was testimony for defendant to the effect that the lights on these posts were white, and not red, but there was also evidence introduced by defendant to the effect that the lights were red. Cord testified that along the north fence there were red lights showing obstructions, that these red lights were on posts four feet high, that "red lights as used on that airport were danger lights." The north boundary of the airport is about half a mile in length, is located on a section line, and adjoining this line to the north is a road, about 40 feet in width, which extends eastward from the northwest corner of the airport about 800 feet. North of the road is a plot of land used as a cornfield. On the east side of this field is Hancock street, an unpaved street, which runs north from the section line into the village of Waynetown. For two blocks north of the road it was unlighted. According to testimony for plaintiff, the tree in question was located in the northeast corner of the corn field, 425 feet north of the airport, 26 feet west of the west line of Hancock street, *and 90 feet east of the green light that marked the east limit of the north entrance to the north and south runway.* On the east side of Hancock street, just north of the road, was a rye field, and plaintiff's evidence showed that the plane, after the collision with the tree, finally landed 208 feet southeast of the tree and just east of the fence on the east side of the street. Defendant concedes that the plane crossed Hancock street before it came to a stop. The height of the tree was estimated by Warren, the caretaker of the airport, at 45 feet, and by other witnesses at 55 and 60 feet. When all of the testimony offered by defendant in support of its theory of fact "that the tree was standing *in the direct line of approach to the entrance* to the north and south runway," is carefully analyzed, it fails to support that theory. Defendant's witness Cord testified that the

tree was 600 feet north of the north line of the airport, and that it was east of the center of the entrance, "150 feet, something, I couldn't say just exactly, but it is 100, around 100. . . . It is east of the most easterly green light of the runway." This testimony locates the tree from 50 to 100 feet east of the east line of the entrance. It is not without significance that defendant's witness Dwiggins, who testified that he was very familiar with the situation of the tree, was not asked to state its exact location. Warren, called by defendant, was employed by the Department of Commerce as caretaker of the airport and had "been so employed since June, 1929, when the field was established." He testified that the day following the accident he made an examination to fix the location of the tree, that it was 45 feet high, that he found, by measurement, the distance from the tree to the north fence of the airport to be 425 feet. During his examination the following occurred: "Q. Did you measure the distance the tree was to the east of the easterly green lights of the two green lights showing the entrance to the airport? A. I believe not, no, there are no measurements. Q. Have you ever made any observations about that? A. Just a noticeable observation as you come down the street. Q. How far east of that easterly green light would you say that tree was located? How many feet? A. Oh I would say 40 to 50 feet. Q. Could it have been more? A. It could be possible, yes." This airport had been in use for a year and yet this witness stated that he never had occasion to pay any attention to that particular tree until after the accident. Defendant's evidence, at first blush, is likely to confuse one as to the location of the tree. To illustrate: On direct Warren testified that the tree "was a little bit east of the center line of the north and south runway." But when he was called upon to testify as to its location in reference to *the entrance* to the runway he readily admitted that the tree was east of it. Moore testified that the

tree "was eastward of the center line or the imaginary center line of the north and south runway." But when further interrogated, he testified as follows: "Q. There was a fence along the rye field wasn't there? A. Yes. Q. There was another fence west of it about the width of a street, wasn't there? A. Yes. Q. And the tree was just a little west of that, wasn't it, that fence? A. Yes." Whether the witness meant that the tree was located just to the west of the fence on the west side of Hancock street or just to the west of the fence on the east side of that street is not entirely clear. If he meant it was just to the west of the fence on the west side of Hancock street he placed it in the same position as did the witnesses for plaintiff, but if he meant it was just to the west of the fence on the east side of Hancock street he placed it many feet farther east of the entrance. It is conceded that "the north and south runway is about *500 feet wide* . . . and is about 1,950 feet long," and defendant admits, as it must, that *the entrance* to the airport and the runway is 100 feet wide. Therefore the testimony of Warren and several other witnesses to the effect that the tree was "a little bit" east of the center line of the north and south runway does not fairly rebut the testimony for plaintiff that the tree was east of the entrance. In its reply brief defendant seems to abandon its contention that the tree "was standing in the *direct line of approach to the entrance* to the north and south runway," and contends, apparently, that the plane had the right to head for the airport anywhere inside of the east and west boundaries of the north and south runway. But defendant's witness Schroeder stated that the green lights are usually 100 feet apart and that they show the entrance into the airport and purport safety to the pilot; that "the entrance lights are about 100 apart, at this airport." Jones, vice president of the Curtiss Wright Corporation, testified that the green lights at the entrance to landing

fields are universally used to light up the runway; that a pilot in approaching the airport at a distance of 1,200 feet would come in between the two green lights. Cord, also a witness for defendant, after testifying that there were green lights on the east and west sides of the entrance into the north and south runway, was further questioned: "Q. And the green lights indicated the entrance to the runway and safety, didn't they? A. Yes, sir."

Defendant contends that "under the facts appearing in the record the defendant was a private, not a common carrier," and "that its obligation to the plaintiff was the exercise of ordinary care, not the highest degree of care." By its printed matter defendant held out to the public Curtiss Flying Service as the "World's Oldest Flying Organization," and that it was located in the following cities: "Baltimore, Md.; Bar Harbor, Me.; Boston, Mass.; Bridgeport, Conn.; Buffalo, N. Y.; Chicago, Ill.; Cleveland, Ohio; Columbus, Ohio; Denver, Colo.; Detroit, Mich.; Enid, Okla.; Hartford, Conn.; Houston, Tex.; Indianapolis, Ind.; Kansas City, Mo.; Los Angeles, Cal.; Louisville, Ky.; Manchester, N. H.; Martha's Vineyard, Mass.; Miami, Fla.; Moline, Ill.; Nashville, Tenn.; New York, N. Y.; Norman, Okla.; Oakland, Cal.; Oklahoma City, Okla.; Palm Beach, Fla.; Portland, Me.; Providence, R. I.; Raleigh, N. C.; Rockland, Me.; St. Louis, Mo.; San Francisco, Cal.; Shawnee, Okla.; Springfield, Mass.; Syracuse, N. Y.; Toledo, Ohio; Worcester, Mass." Its printed matter also contained the following:

"GOING SOMEWHERE QUICKLY!

"Fly there with CURTISS-WRIGHT Flying Service

"In the rapidly moving affairs of today, the airplane is essential. It eliminates the barrier of distance, brings the business and social centers of the country closer together by hours—enables everyone,

no matter what his interests, to increase the scope of personal activities—to do more, see more, and add zest to living!

"In this service of speedy transportation, the outstanding leader is the Curtiss-Wright Flying Service—*nation-wide in its scope and facilities*—the 'World's Oldest Flying Organization.'

"All other accepted modes of travel are limited to their rights-of-way. But the airplane knows no such bounds. The air lanes lead everywhere, as directly as flies the crow. Travel by airplane frees you from the delays and discomforts of congested highways—eliminates the nuisance of dust, heat and crowds, *and gets you there speedily, safely and in comfort.*

"For a quick hop to that favorite trout stream—fly there. To quickly reach the bedside of a dear one—or bring together doctor and patient without loss of time—Fly! No matter what for or why—whether for pleasure, business or where minutes saved mean life itself—Fly with Curtiss-Wright Flying Service.

## "How Charges Are Based

"Charges are based on the operating cost of the plane per mile—not on the number of passengers or amount of luggage. You may carry friends or baggage up to the capacity of the plane without extra charge.

"The tariffs for chartering Curtiss-Wright equipment are uniform throughout the United States—are comparable to the cost of other means of transportation.

"For detailed information about this speedy and *dependable* service, call the nearest Curtiss-Wright branch. It is listed on the back of the page following.

## "On Business

"Fly and save time. Make your minutes more productive. Keep more closely in touch with important

affairs and link your inter-city contacts together with Curtiss-Wright Flying Service. Only by flying can you keep down loss of time through travel.

"On Pleasure Bent

"Fly to your destination. Make week-ends last longer—add hours to your play time. Vacation days speed by all too swiftly—why not fly there and enjoy them longer? Avail yourself of the speedy, reliable Curtiss-Wright Flying Service.

"In Emergency

"Fly! Cut time losses and consequent risks to the minimum. Minutes may mean life itself. Today, thanks to *the efficient and reliable* Curtiss-Wright Flying Service, doctor and patient, lawyer and client, seller and buyer, are hours and even days nearer to each other.

"When A-Hunting You Would Go

"Fly there! Then hours sooner will you thrill to the breath of the pines, the excitement of the first nibble—the break of the quarry from cover. No matter where your hunting preserve is, you can reach it most easily and quickly with Curtiss-Wright Flying Service." (Italics ours.)

Russell testified that he was employed by defendant to solicit traffic and that in connection with his work he distributed advertising matter of the company, of the kind we have cited, in various hotels, clubs and travel bureaus; that as part of his duties he endeavored to get people to ride in the airplanes of defendant.

In *Anderson v. Fidelity & Casualty Co.*, 228 N. Y. 475 (*decided in 1920*), the court said (p. 480):

"The term 'common carrier' is not of statutory origin. Its meaning is to be found in the history of the law of the early days when means of travel and communication were slow and uncertain and innkeepers and carriers were restrained from the robbery and

ofttimes murder of those to whom they offered their hospitality or service, only by the imposition of heavy penalties and responsibility for the safekeeping of their patrons' goods and persons. (*Nugent v. Smith,* L. R. 1 C. P. D. 423; *Coggs v. Bernard,* 2 Ld. Raym. 909, 1 Smith's L. Cas. 199.) . With the development in traveling facilities from the post horse to the chaise, the stage coach and to the modern railroad train or steamboat, the term 'common carrier' has been applied to each new development catering to the public generally, and the strict rules of the old law have been relaxed but little, for with the development came new dangers of a mechanical sort inherent to swiftly-moving machines. (*Palmer v. Prest., etc., D. & H. Canal Co.,* 120 N. Y. 170; *Ingalls v. Bills,* 9 Metc. 1; *Hegeman v. Western Railroad Corpn.,* 13 N. Y. 9.) Today, as is practically conceded by counsel for both parties in the instant case, the term 'common carrier' should be applied to the 'jitney bus,' and tomorrow, in a proper case, it may well be that it may be applied to that most recent device for eliminating the fetters of distance, the aeroplane, presenting as it does new dangers unknown to the average man which can only be decreased by a high degree of care upon the part of those in control of the mechanism which operates them.''

In Hotchkiss on Aviation Law, p. 62, sec. 52, the author says:

''The loose application of the term common carrier to railroads alone is far from accurate. In a New York case (*Jackson Iron Works v. Hurlburt* (1899), 158 N. Y. 34) it is said that truckmen, wagoners, cartmen, and porters who undertake to carry goods for hire as a common employment in a city or from one town to another are common carriers. The term has also been applied to hoymen, bargemen, lightermen, and canalboat men, and it has been said that 'it is wholly immaterial in what kind of vessel or vehicle or for what distance the carrying is done.' (Hutchinson,

Law of Carriers, 3rd Ed. (1906), sec. 64.) There is, therefore, reason to suppose that aircraft may readily fall within the legal category of common carriers. The determination of this in a given case may be of the highest importance, for at common law the liability of a common carrier of goods was held to be that of an insurer. (Id. sec. 265.) The carrier of passengers, at common law, while not an insurer of their safety, is nevertheless called upon to exercise the highest care. (Id. sec. 892.)''

In *Rathbun v. Ocean Accident Corp.*, 299 Ill. 562, the court says (p. 567):

''Jitney-bus proprietors and owners of stage coaches, hacks and omnibuses have generally been held to be common carriers. This is so because in their business they serve all the public alike who apply to them for carriage so long as they have room, and they are held common carriers regardless of the fact whether they operate in cities or from town to town or from city to city, so long as they maintain their status as public carriers, carrying all who apply and refusing none unless they have no room or for some other legal reason may refuse. It does not make any particular difference as to their being common carriers that their passengers may designate the way and the place to which the passengers may be carried, but after the carriages are entered by the passengers such carriers must necessarily have control and regulation of the passengers' conduct and of the operation of the carriages before they can be held to the extraordinary liability of common carriers to such passengers. Livery-stable keepers lack one of the essential qualifications,— a readiness to carry any and all persons who apply and offer to pay the charges of carriage and comply with the regulations. (*Parmalee v. Lowitz,* 74 Ill. 116; *Stanley v. Steele,* 2 Ann. Cas. (Conn.) 342.)''

In *Berg v. Seitz* (Kan.), 1931 U. S. Av. Rep. 111, wherein the defendant made the contention that the

rule as to common carriers of passengers for hire did not apply for the reason that the plane in question was not regularly used for transporting passengers from point to point and that the defendant operated on no fixed schedule, the court said (p. 118):

"In the opinion of the Court, it is immaterial whether the plane was regularly used as a common carrier of passengers for hire, or whether the defendant was under a duty to accept the plaintiff as a passenger, when it is considered that the plaintiff was, in fact, a passenger on said plane subject to the same perils to which a passenger in the regular sense would be exposed. The nature of the conveyance and the great danger involved would seem to require the utmost practical care and prudence for the safety of passengers; and therefore, the instruction given by the Court that the defendant was bound to exercise the highest degree of human care, caution and judgment consistent with the practical operation of said plane, was amply justified. No degree of care and prudence less than that stated would be adequate under the circumstances, or commensurate with the danger involved."

In *Hagymasi v. Colonial Western Airways, Inc.* (N. J.), 1931 U. S. Av. Rep. 73, the court held that a company which carries passengers on sight-seeing airplane trips for hire and accepts all applicants except those who are "obnoxious" by reason of intoxication or otherwise, is a common carrier. (See also *Foot v. Northwest Airways, Inc.* (U. S. Dist. Ct. Minn.), 1931 U. S. Av. Rep. 66; *Law v. Transcontinental Air Transport, Inc.* (U. S. Dist. E. D. Penn.), 1931 U. S. Av. Rep. 205.) In this State the meaning of the term common carrier has been extended, and it now applies to an operator of a scenic railway in an amusement park, *O'Callaghan v. Dellwood Park Co.*, 242 Ill. 336; to a merry-go-round, *Arndt v. Riverview Park Co.*, 259 Ill. App. 210; to a ride in an amusement park, "The Pep,"

*Haars v. White City Amusement Co.,* 262 Ill. App. 657 (Abst.); to an elevator in a building, *Beidler v. Branshaw,* 200 Ill. 425, and to taxicabs, *Metz v. Yellow Cab Co.,* 248 Ill. App. 609 (certiorari denied by the Supreme Court.) Our Supreme Court has frequently stated that a common carrier is one who undertakes, for hire, to transport, from place to place, such persons or the goods of such as choose to employ it.

No sound reason has been advanced why, under the facts of this case, defendant should not be held to be a common carrier of passengers, and, in our judgment, it would be a very unjust and partial rule to hold that it was not. But, in any event, it tried the case upon the theory that it was a common carrier, and it will not be allowed to now raise the instant contention. Defendant's instruction number eight, given to the jury, contains the following:

"8. The Court instructs the jury that in this case the defendant . . . was not a guarantor or insurer of the safety of the plaintiff during the passage or trip in question, but that under the law it was only required to exercise 'the highest degree of care in the management and control of said aeroplane consistent with the practical operation of the same . . . .''

This instruction, also defendant's instruction number nine, is based upon the theory that defendant was a common carrier. Defendant complains of the court's refusal to give its instructions numbers 26 and 28. Twenty-six required of the pilot of the airplane "the highest degree of care on his part''; and 28 required defendant to exercise "the utmost care for the safety of passengers.'' Plaintiff's counsel, in his opening argument, contended that defendant was a common carrier and defendant interposed no objection to the contention.

We deem it unnecessary to pass upon defendant's contention that the doctrine of *res ipsa loquitur* does not apply to the facts of this case. The declaration

charges that "through the negligence and improper conduct of the defendant, the said airship . . . ran into and struck with great force . . . against a tree . . . and thereby in consequence of said collision with said tree, the said airship or aeroplane fell," etc., and if plaintiff proved these charges she made out a prima facie case, regardless of the question as to whether or not the doctrine of *res ipsa loquitur* applies.

We find no merit in defendant's contention that there is no evidence tending to show that it was guilty of negligence as charged, and that the court erred in refusing to instruct the jury to find defendant not guilty at the close of all the evidence. We have heretofore pointed out that defendant tried the case upon the theory that it was a common carrier and was bound to exercise the care required of such a carrier. Cord testified that he was at his garage, situated in the center of Waynetown, when he saw the airplane come from the north and go south, flying at an altitude of about 500 feet; that the plane flew over the airport over the north and south runway and to about a mile south, then circled back east and north over the beacon light in the airport and continued north a distance of about two miles northeast of Waynetown; that it then made a bank and the landing lights were turned on and it then turned to the northwest and flew that way about half a mile; then flew back over the town and directly over Main street; that at that point the plane was about 150 feet up; that the pilot then banked off towards Hancock street and when he reached it he "straightened up" and went south over it; that he was continuously going down after he left Main street and the airplane finally got down behind the trees along Hancock street and could no longer be seen; that during this maneuvering the plane had a front light and two strong searchlights, one under each wing; that as it passed over the town the weather conditions were clear and there was not much wind; that shortly after

the plane disappeared he was told of the accident. Cord's testimony also shows that the plane struck the east side of the tree in question and tore off limbs from that side 10 to 15 feet long and 4 or 5 inches in diameter. He took a photograph of the tree that morning, which, taken in connection with his testimony, shows that limbs about 20 feet from the ground were broken off the tree on the east side, and the jury were warranted in finding that at the time the plane struck the tree the bottom of the plane could not have been more than 20 or 25 feet above the ground. This tree, situated 425 feet north of the airport, was on land belonging to one of the townspeople, and, as we have heretofore pointed out, was not on a line with *the entrance* to the airport—in fact, it was at least 90 feet east of the easterly green light of the entrance. Blanche Monroe, a witness for plaintiff, lived on the southwest corner of Hancock street, two blocks from the airport. She testified that the sound of a plane's motor awakened her from sleep and she heard an airplane as it passed over her house; that there were some maple and sugar trees about 49 feet high next to her house and in the morning she found the yard was covered with leaves, twigs and small limbs, some as long as 3½ to 4 feet; that they were not on the lawn the night before; that there was no wind storm nor storm of any kind during the night; that shortly after the plane passed over her house she heard a crash and in a few minutes one of the neighbors told her that an airplane had crashed. Defendant made an effort to discredit the testimony of this witness, but, in our judgment, the jury were warranted in believing her. Her testimony is corroborated by that of Cord wherein he states that when the pilot reached Hancock street he "straightened up" and went south over that street and that he was continuously going down at the time and that the witness lost sight of the plane when it got behind the trees on that street. This testimony tends to show

that the plane, when it passed the Monroe house, was already low enough to brush the trees there. Evidence for plaintiff shows that as the plane approached the airport the last time it had two strong searchlights, one under each wing of the plane. In describing these lights, Cox, a witness for defendant, stated: "They were typical streamline landing lights, adjusted on the wing struts of the plane. . . . They are similar to the headlights on a car; they light up the area to one side and in front in landing." Schroeder testified, for defendant, that these lights "are a good deal like automobile headlights," and after a pilot enters the airport he depends entirely upon these landing lights; that these lights would throw a beam 700 feet in length; that if one were directed toward a building 700 feet away the beams would reach it. Dober, testifying for defendant, stated that before the plane left Glenview he adjusted the lights, at the pilot's request, in such a position that the beam would shoot out at an angle of about 10 degrees; that the beam of light cast by the lights would go forward and to the side of the plane at an angle; that with the lights as adjusted the pilot would not be flying blindly. Defendant's witness Darr testified that the beams "were slightly down, below and parallel to the body of the plane"; that the lights shine "down some distance ahead of the ship"; that the beam would carry about the same as an automobile light, "probably 200 feet where they hit the ground . . . from 2 to 300 feet"; that if the plane, while in the air, is pointed down, "those lights tilt further to the ground" and they will cast a beam for 2 to 500 feet. While defendant sought to prove that these searchlights were used only to illuminate the area to the sides and in front of the machine *as the pilot glided into a field and was landing,* the jury were justified in discrediting this testimony. In any event, the pilot in the instant case had these lights burning before the accident. In addition to these lights the plane carried

magnesium flares, approximately 3 inches in diameter, 2 feet long, with a parachute attachment, and the pilot, by pulling a lever, "kicks out a flare that burns for five minutes, and the parachute causes it to lower slowly and the flare illuminates the terrain under the plane." Moore testified that there were two flares in the airplane when it started and that neither was missing when he examined the ship after the accident; that they "were intact and in place"; that a flare "can be set in operation by the operation of a lever under the control of the pilot"; that when a flare is released by the pilot, a magnesium light lights up the surrounding territory, and that by means of the parachute the surrounding territory is lighted up for four or five minutes. Defendant contends that the evidence shows that the flares are used only in case of a forced landing outside of airports and that in the instant case the landing was being made in a lighted landing field. In support of its contention as to the use of flares it calls attention to certain evidence given by Darr, but which was stricken on motion. It is true that Cox, a witness for defendant, testified that he "never used any flares in landing at night at a lighted airport," and Jones testified that they were *"generally used* in case you have to make an emergency landing at any place where there is no lighted airport," that they "are within the control of the pilot"; but, nevertheless, the jury were warranted in finding that the pilot, in the exercise of the care required of him, should have used a flare. Nor was the pilot actually landing at the airport at the time of the accident. In defendant's instructions the jury were told that defendant was required to exercise the highest degree of care consistent with the practical operation of the airplane; that the pilot was required to exercise "the highest degree of care," and to exercise "the utmost care for the safety of passengers." According to the testimony of defendant's witnesses, had the pilot, as he approached the airport, pulled a lever,

a flare would have been released that would have "illuminated for 4 or 5 miles the terrain under the plane," or, as one witness states, "the surrounding territory would be lighted up." It is sufficient to say, in answer to the argument of defendant that it would be dangerous to use a flare in passing over a town, that the accident happened in the open country, between the town and the airport.

We have read the entire transcript of the evidence, and after a very careful consideration of all the facts and circumstances we have reached the conclusion that the jury were fully warranted in finding that had the pilot exercised the care required of him as a servant of a common carrier, or even ordinary care, the accident would not have happened. Defendant states that the pilot may have attempted to land because he was tired, and, in our judgment, this is the most reasonable inference that can be drawn from the evidence. He had already, on that date, piloted a sightseeing trip which consumed "2 hours and 28 minutes of flying." By his written orders he was told to "go through as far as possible without stopping for sleep." Plaintiff was informed that the first stop would be Evansville. In over three hours of travel the plane had made but approximately 130 miles at the time of the accident. The airport at Waynetown was merely an *emergency* landing place. There was a fully equipped airport at Terre Haute "a few miles away." Defendant's witness Darr testified, on cross-examination: "Going down, leaving Chicago, you go through LaFayette before you get to Waynetown. . . . LaFayette has an airport . . . fully equipped for gas or anything the pilot might want. . . . The distance between LaFayette and Waynetown is about 25 miles." The *entrance* to the Waynetown airport was plainly marked by green lights, and the pilot, if he had been flying at a reasonable altitude and *on a line with the entrance,* should

have been able to enter the airport, where he would have had a runway of 1,950 feet. Either the pilot was too tired to exercise proper care, or he had lost his way, or had, for some reason, become confused. In any event it is clear he did not exercise "the highest degree of care on his part." Defendant argues that travel by air is a new mode of transportation and that there are many perils and uncertainties connected with the same over which the pilot can have no control, and that passengers necessarily take upon themselves the risk of dangers incident to such mode of travel. A common carrier must be honest and fair in its dealings with the public. (See *Princell v. Pickwick Greyhound Lines*, 262 Ill. App. 298. Certiorari denied by the Supreme Court.) Aviation is no longer an experiment. Great airplane lines are engaged in the transportation of passengers, mail and express. Their service covers the entire country, and it is a matter of common knowledge that such lines are held out to the public to be a safe means of transportation. In the instant case defendant informed the traveling public that it would get its passengers to their destinations "speedily, *safely* and in comfort," and that it was willing to carry all who sought its service, and it comes with poor grace from defendant to argue that the general rules relating to the care that must be exercised by common carriers should not apply to it. Defendant cites an authority holding that airplane transportation companies are not responsible for acts of God, but we fail to see how this principle of law can have any application to the facts of the instant case.

Defendant contends that "the trial court erred in overruling defendant's motion for a new trial because the verdict of the jury is against the manifest weight of the evidence." After a careful consideration of all the facts and circumstances we have reached the conclusion that this contention is without merit.

Defendant contends that the court erred in refusing to give to the jury instruction number 26, which reads as follows:

"The Court instructs the jury that if you believe from the evidence in this case that the pilot, Harold Mayer, was an experienced and skillful pilot, and that he did not know, or in the exercise of the highest degree of care on his part could not have known, of the presence or position of the tree with which he collided and that in determining and attempting to land at the field in question he exercised his best judgment, and that his course of action in attempting to make the landing in question was such as would have been approved by expert and competent pilots, then and in such case the defendant cannot be held liable and your verdict should be not guilty."

This instruction is based upon the assumption that the tree was in the path of a proper approach to the entrance to the airport, whereas the evidence clearly shows that it was not. It informs the jury that if the pilot "in determining and attempting to land at the field" "*exercised his best judgment*" and his action "was such as *would have been* approved by expert and competent pilots," their verdict should be not guilty. Under the facts and the law the pilot might be found grossly negligent even though he exercised his best judgment and his action was such "as *would have been approved* by expert and competent pilots." The instruction is otherwise bad and would only tend to mislead the jury.

Defendant contends that the court erred in refusing to give to the jury defendant's instruction number 28, which reads as follows:

"While the law demands the utmost care for the safety of passengers, it does not require aeroplane companies to exercise all the care, skill and diligence of which the human mind can conceive, nor such as will free the transportation of passengers from all

possible perils. The plaintiff in this case necessarily took upon herself all the usual and ordinary perils incident to aeroplane travel, and if you find from the evidence that the defendant exercised all the care, skill and diligence required by law as defined in these instructions, and that nevertheless the accident occurred, the defendant would not be responsible therefor and your verdict should be for the defendant.''

In support of this instruction defendant cites several cases, like *Allison v. Standard Air Lines, Inc.* (U. S. Dist. Court S. D. of Cal.), 1930 U. S. Av. Rep. 292, in which the court passed upon a somewhat similar instruction, but therein the answer set up as a defense that the accident was due to weather conditions which could not be foreseen, and for which defendant was not liable; that it operated its plane through San Gorgonio Pass, which is generally, but not always, free from clouds and fogs; that after entering the pass the plane became enveloped in a fog completely obscuring vision; that by reason thereof, the pilot lost his way. and the airplane was wrecked, and that the accident was caused by an act of God. In the instant case there were no fogs, nor poor visibility, nor storms, nor quick changes in the weather, nor perils, that played any part in the accident, nor is there even any evidence tending to show a failure of the equipment to function properly. The negligence of the pilot in striking the tree, if he was negligent, as charged, was not a usual and ordinary peril incident to airplane travel. The instant contention is without merit.

Defendant contends that the trial court erred in admitting, over the objection of defendant, plaintiff's exhibits 4 and 5. Defendant contends that these two exhibits consist of two pages from a catalogue of a distinct corporation and that therefore nothing contained therein was binding on defendant, and further, that they did not tend to prove any issue in the case. Defendant concedes that ''the admission of these docu-

ments standing alone might not have been a matter of serious consequence, but their admission together with argument of counsel for plaintiff in reference thereto, constitutes serious and prejudicial error.'' Counsel calls our attention to parts of the opening argument for plaintiff, made by Mr. Mahoney, but we find that defendant failed to make a single objection to any part of the argument, and it is settled law that alleged improper remarks of counsel during his argument cannot be made a ground for complaint in a reviewing court where no objection was entered at the trial. In the closing argument for plaintiff but one objection was made that could have any possible reference to the instant contention. As to that the record shows that Mr. Cunningham, during his argument, said: ''Did we send Russell to sell planes from that catalogue? Mr. Kealy (attorney for defendant): I submit this argument about selling planes is improper, because we are not concerned with the sale of aeroplanes. We are concerned only with the operation of the plane in this accident. The Court: Objection overruled.'' We fail to see how this statement could be held to be serious and prejudicial error. Plaintiff's exhibit 4 is a ''Three-quarter front view of a Challenger-Motored 'Robin' monoplane, part of a catalog of the Curtiss Robertson Airplane Manufacturing Company, *a Division of Curtiss-Wright* and used in May, 1930, in the sale of planes by the Curtiss people.'' Plaintiff's exhibit 5 shows specifications and description of the ''Challenger-Robin,'' and gives full capacity, high speed, cruising speed and cruising range. The catalogues were not only used as a sales help but as an advertising piece of literature. Russell testified that he was not only employed by defendant to solicit the public to ride in its aeroplanes, but that he also had selling connections with the Curtiss-Wright people; that he placed folders in hotels and clubs for the general public; that defendant used this catalogue as a

sales help and advertising piece of literature; that he recognized in plaintiff's exhibit 4 a picture of the particular plane that figured in the instant accident; that the specifications accompanying the picture are the specifications of the particular type of plane that figured in the accident. From this testimony, which was not rebutted, it appears that he, as an employee of defendant, used these catalogues not only in the advancement of the general business of the ''Curtiss-Wright people,'' but in his efforts to procure traffic for defendant, and that in the performance of his duty he distributed these catalogues to the public. Defendant introduced (defendant's exhibit 14) ''a photograph of the type of plane involved in this accident, a quartering front view showing the size of the ship, the cabin and the left wing.'' After a careful inspection of plaintiff's exhibit 4 and defendant's exhibit 14 we are satisfied that there is merit in plaintiff's argument ''that the two pictures are identical, and that the illustration in Plaintiff's Exhibit 4 was made from the same negative as Defendant's Exhibit 14.'' It was stipulated that the front cover sheet of the document that contained plaintiff's exhibit 4 showed the following printed matter:

''The Curtiss Robertson Airoplane Manufacturing Co.
''Division of Curtiss-Wright.

''Designers of the 'St. Louis Robin.' Producing 'Challenger Robin' and 'J-6165 Robin,' the '0X5 Robin' three-place Cabin Monoplanes, and the 'Thrush' six-place Cabin Monoplane.

''Curtiss-Wright Sales Corporation, 27 West Fifty-seventh Street, New York City.''

The two exhibits, as plaintiff contends, tend to show the connection between these companies. As plaintiff's exhibit 4 shows a picture of the same plane that appears in defendant's exhibit 14, it seems idle to argue that defendant was prejudiced by the admission of

plaintiff's exhibit 4. We find no merit in defendant's argument as to plaintiff's exhibit 5.

Defendant contends that "the verdict and judgment are for an excessive amount." There is a mass of evidence bearing upon the alleged injuries to plaintiff, and we have studied the same carefully; but it would unduly lengthen this opinion to attempt to detail the same. Suffice to say that we are satisfied that we would not be justified, under the evidence, in holding that the verdict and judgment are for an excessive amount.

The trial court seems to have conducted the trial ably and impartially. The judgment of the circuit court of Cook county is a just one and it should be and it is affirmed.

*Affirmed.*

GRIDLEY, J., concurs.