## Illinois Highway Transportation Company, Appellant, v. Walter Hantel et al., Appellees.

### Gen. No. 9,426.

Opinion filed April 12, 1944.
Opinion modified and rehearing denied July 6, 1944.

GEORGE Z. BARNES and CLYDE R. BIRKETT, both of Peoria, for appellant.

HOMER B. HARRIS, of Lincoln, and SHELTON MC-GRATH, of Peoria, for appellees.

MR. JUSTICE RIESS delivered the opinion of the court.

Plaintiff, Illinois Highway Transportation Company, a corporation, has appealed from certain decretal orders of the circuit court of Tazewell county, wherein a temporary injunction previously granted against defendants appellees, Walter Hantel, Victor Sandel and M. A. Kirkhart was dissolved; damages and solicitors'

fees were awarded to the defendants and the plaintiff's complaint was dismissed for want of equity.

On March 5, 1942, the plaintiff, a public utility company operating certain motor bus lines under Certificates of Convenience and Necessity previously granted by the Illinois Commerce Commission, filed a suit in equity wherein it was charged that the defendants were unlawfully operating motor busses as public utilities and as carriers of passengers for hire without a Certificate of Convenience and Necessity over a part of the route designated in plaintiff's certificates, in competition with and to the financial injury of the plaintiff. The verified complaint sought both a temporary and a permanent injunction restraining the defendants from continuing such operation of motor bus service and prayed for the recovery of alleged damages. A temporary injunction without notice or hearing was issued upon an interlocutory order of the chancellor, followed by motions in the nature of demurrers by the defendants to dissolve the same, which motions were overruled and the defendants then filed separate answers denying that they were unlawfully operating as public utilities or as carriers of passengers indiscriminately for hire requiring such certificates but averring that they operated as private carriers under contractual arrangements with two groups of employees of the Caterpillar Tractor Company between the homes of said employees in Lincoln and certain intervening points, to and from the manufacturing plant of said company in East Peoria, Illinois, where such workmen were severally employed on one of three daily eight hour shifts in war work by the Tractor Company which was engaged in the manufacture of necessary war materials.

The case was referred to the master in chancery to take and report the testimony with findings and conclusions of law and fact and to recommend form of decree. The testimony of witnesses of the respective

parties was duly heard and the master's report with findings, conclusions and recommendations was filed with the court, together with objections to certain findings and conclusions of the master which had been filed by the plaintiff and overruled by the master and stood as exceptions before the court. The exceptions were heard and overruled by the chancellor; the report of the master was approved and the temporary injunction was dissolved. Suggestions of damages were filed by the defendants and evidence was heard thereon upon reference to the master, duly reported to the court, and damages were assessed by the court together with solicitors' fees for alleged services of defendants' counsel in procuring a dissolution of the temporary injunction.

Plaintiff assigned errors on the part of the trial court in approving the findings of the master in chancery that the busses owned and operated by appellees were not subject to the jurisdiction of the Illinois Commerce Commission under the provisions of the Illinois Public Utilities Act, and in overruling the plaintiff's exceptions to such findings; in approving the master's findings "that the bus lines owned and operated by the appellees were operated as private and not as public or common carriers, and in overruling appellant's exceptions to such finding"; in refusing to grant a permanent injunction as prayed and in dismissing plaintiff's complaint for want of equity; in dissolving the temporary injunction and in assessing damages against the plaintiff in favor of the defendants, asserting that such damages were not supported by the evidence; error in overruling each and all of plaintiff's exceptions to the original and supplemental reports of the master in chancery, asserting that the decree was contrary to the law and the evidence.

As to some of the material facts, there is no conflict, while there is a material conflict in the evidence concerning arrangements for and services rendered

and furnished in the operation of the two motor busses by the respective defendants under certain purported verbal and subsequently written contractual arrangements between the defendants and said respective groups of employees of the Caterpillar Tractor Company, which employed approximately 16,000 workers. It appears in substance from the findings of the master in chancery as approved by the court, which we deem to be in accord with the greater weight of the evidence, that employees of the Tractor Company were obliged to travel to and from their daily work during one of the three eight hour shifts or periods of employment at said plant, beginning at approximately 8 a. m., 4 p. m., and midnight of each week day or Sunday on which the respective employees were obliged to report for duty. It further appears that numerous employees of said Tractor Company resided at various places and were obliged to reach their daily place of employment and to return to their respective homes by such means of conveyance as were available to them; that in December 1941, when America entered the World War, a tire rationing program of the National Government was put into effect, prior to which time many of the war workers who so resided in Lincoln or intervening points between that city and the Caterpillar plant at East Peoria had either used their own cars or shared with others in the use of automobiles in going to and from their work. It further appears that under the emergency which had thus arisen, they then sought to make other suitable arrangements for such necessary transportation and means of conveyance and that at such time no schedule of any public utility met or had suitably arranged to adequately meet their necessary requirements for travel between their various homes and said place of employment. The plaintiff utility company had operated a certificated motor bus line as a public or common carrier of passengers for hire between Peoria, East Peoria and Pekin, Illinois, since

1927. On March 18, 1941, an additional certificate was granted extending its route from Peoria through Pekin to Lincoln and Decatur, Illinois and intervening points along said route, and it procured valuable additional equipment and busses and maintained a regular rate and time schedule for the use of the public in general including a number of employees of the Tractor Company who lived along portions of its travel route.

Following the tire and gas rationing orders, a number of said workers residing at Lincoln held group conferences or meetings for the purpose of procuring or arranging for transportation to meet the necessities of the existing emergency. Some of them discussed their problem with the Chamber of Commerce, the local Defense Co-ordinator, the Interurban Railroad Company operating between East Peoria and Lincoln, a Lincoln taxicab company, and some of them also called upon the plaintiff company at its office in Lincoln. Their spokesman was told in substance by the agent of the plaintiff company that if they procured seventy-five or more daily passengers, they would be given a rate of seventy-five cents per round trip per passenger on a weekly ticket basis of $4.60, with no alternative refund for traveling a less number of days per week nor for any subsequent use of the tickets and that necessary bus transportation would then be provided. A list was circulated by one of the men named Claude McAllister who was at that time able to procure only twenty-four signers and he testified that he therefore did not return to the Company's office. The men caused an item or announcement to be placed in the local daily newspaper at Lincoln which was printed without charge to them requesting employees of the Tractor Company who were interested in the above transportation to call at the newspaper office and sign a paper, to which forty-eight signatures were then obtained prior to February 12. No further negotiations between the men and the plaintiff company were had.

The former did not return to the company office but thereupon sought other means of transportation. Part of the group of employees discussed the question of furnishing bus service to meet their necessities with defendant Walter Hantel, who agreed to procure a bus and furnish conveyance to war workers employed at the Caterpillar plant who might wish to join their group, at the price of sixty-five cents per round trip per person or $3.90 per week on the basis of three round trips per day and for sixty cents per round trip per person if the number of daily employees so joining in said arrangement exceeded sixty passengers per day, with refunds on weekly tickets for days not traveled. A lesser rate was so arranged for the workers who lived at intervening points nearer to the plant at East Peoria, including those not located on the route traveled by plaintiff company. The busses were to leave from in front of the City Hall in Lincoln and pass along a route, which would substantially shorten the distance to the Tractor plant and also pick up those employees who joined in the arrangement at the three intervening stops or villages not located on the route of the plaintiff company. Some of the employees were delivered at the main entrance and the remainder continued on to the parking lot on the premises of the Tractor Company. Some of the men began work as much as 15 or 20 minutes before the hour and some continued work for that length of time after the approximate hour of each of the shifts on which they were employed, and the busses were to remain there for such length of time as was necessary to protect the employees against the weather, and to arrive in time or remain until all the men reached or left their said place of employment on the different shifts, regardless of the length of time such service would require. No provision was made for carrying any other passengers than said employees, who were identified by badges which they wore and some also by the shoes required

by the Tractor Company, while many of the men were personally known to the bus drivers. Daily or weekly round trip tickets were furnished and sold to each of them as above indicated. A similar arrangement to that of the Hantel group was made between another group of said war workers and the defendants Sandel and Kirkhart, who operated their bus as copartners. Two International school type busses were purchased; one by Hantel for $3,024, being a twenty-eight passenger bus and another by Sandel and Kirkhart for $2,500, being a forty passenger bus. Two tiers of the seats were removed from the rear and the remainder so spaced as to allow ample room between the seats to thereby better accommodate travel by the employee passengers. A notice or announcement to Caterpillar workers of the time and place when the busses would leave Lincoln was inserted in one issue of the Lincoln daily newspaper by each owner, which notice the bus owner testified to having been published to invite or notify the men entering the arrangement in lieu of personal or telephone notices to each of them, and only one notice was so given by each owner. No schedule was carried in any advertisement to the general public nor were the above notices directed to the public in general. No reference was made therein to any person but employees of the Caterpillar Company. Before using his bus, Hantel caused the following inscription to be placed or painted upon the exterior of his bus; "Walter Hantel, Caterpillar men only." The Kirkhart-Sandel bus bore the inscription "Bee-Line Bus Service, Caterpillar workers Only." Liability insurance was procured and carried by each of the defendants. The operation of the two busses was begun by the respective defendants pursuant to the above verbal agreement and arrangements on February 18, 1942, and the busses continued to make the three round trips daily for the ensuing two weeks, when the temporary restraining order of the court was served upon them

and was continued in effect for forty-two days at which time it was dissolved and was followed by the subsequent action and orders of the chancellor hereinabove recited. It clearly appears from the greater weight of the testimony that no passengers other than the respective groups of employees with whom the defendants had negotiated and other employees who might expressly join in that arrangement were either invited or permitted to ride upon the above busses aside from three or four individuals who rode one trip only to the tractor plant on the busses without charge while seeking employment there, according to the testimony of the defendants, and it also appears from the master's approved report of testimony and from the evidence that passengers were neither indiscriminately given transportation nor was the public in general invited or permitted to travel on the above busses.

Reference was made in the testimony of the defendants to advance trips made by them to Springfield where they had consulted George W. Anderson, Superintendent of Motor Vehicles of the Illinois Commerce Commission, as to whether or not they would be required to obtain Certificates of Convenience and Necessity and that they were advised that if the bus service consisted of transportation of the particular group of individuals under some private contractual arrangement with the operator, and if the service is not to be made available for general public use, the operation was not subject to any regulation either of the Commission or other State departments. Objection to this proof was made and sustained by the master as hearsay and as immaterial upon the questions as to whether or not they were legally required to take out such certificates as public utilities or as carriers of passengers indiscriminately for hire in furnishing the transportation in question. The statement was permitted to stand in the record as tending only to show the good faith of the defendants in seeking such information.

On behalf of the defendants, all of them testified, together with their drivers and the witness McAllister and another employee group leader and Caterpillar worker named Kavelman. For the plaintiff, aside from the exhibits offered and admitted, the officers or agents of the Company at Lincoln and Peoria testified, together with two of the passengers who rode upon the busses as applicants for employment at the Caterpillar plant and contended that they had paid for their tickets, which was denied by the defendants. These witnesses were subsequently employed by the plaintiff company and were so employed at the time they testified. Certain witnesses also testified as to time and rate schedules, costs of operation of the busses and service furnished by plaintiff and defendants, and on the question of damages and solicitors' fees. We cannot herein detail all of the testimony of record in controversy relating to the operation of the busses on each of these daily trips and the number of passengers concerning whom extended direct and cross-examination of witnesses was had, but from carefully reading and considering the entire record, we are satisfied that in the finding of facts which were material to the issues herein, the master's report and the decree of the chancellor confirming the same were in accord with the greater weight of the evidence, and we further find and hold that the master did not err in his recommendation nor the court in its decree finding under the particular facts and circumstances disclosed by the evidence that the respective defendants were not operating as public or common carriers or as public utilities who would be required to procure Certificates of Convenience and Necessity from the Illinois Commerce Commission, but were operating as private carriers under specific contractual arrangements with the particular group of employees to whom they furnished such transportation, and that the written agreements signed by the respective parties and offered in evi-

dence, although signed subsequent to the filing of the suit by the plaintiff, confirmed in substance the oral agreements and arrangements previously entered into by the parties and in no way prejudiced the rights of plaintiff, who was seeking by its suit to obtain not only the continuation of the temporary but also a permanent injunction restraining all future operations by the defendants.

In the appellant's brief, it is said that "The question at issue in this case is whether the bus lines were operated as private carriers, which were not subject to regulation by the Illinois Commerce Commission, or as public utilities," and that the court erred in holding "that the bus lines owned and operated by the appellees were operated as private, and not as public or common carriers."

Concerning the second of the foregoing questions or contentions of the appellant, which also constitutes its second specific assignment of error, the rule applies that when the plaintiff affirms and the defendant denies that the defendant is operating as a common carrier, the question becomes a controverted question of fact to be determined by a consideration of the evidence by the trial court. *Rathbun v. Ocean Accident & Guarantee Corp., Ltd.*, 299 Ill. 562, 132 N. E. 754; *Bare v. American Forwarding Co.*, 242 Ill. 298, 89 N. E. 1021; *Hinchliffe v. Wenig Teaming Co.*, 274 Ill. 417, 113 N. E. 707; *Beatrice Creamery Co. v. Fisher,* 291 Ill. App. 495–498, 10 N. E. (2d) 220.

The weight and trend of authority in Illinois holds that a common carrier is one who undertakes for the public to transport from place to place such persons or the goods of such persons as choose to employ him for hire. *Transformer Corp. of America v. Hinchcliff,* 279 Ill. App. 152; *Rathbun v. Ocean Acc. & Guar. Corp., Ltd., supra; McCusker v. Curtiss Wright Flying Service, Inc.,* 269 Ill. App. 502; *Beatrice Creamery Co. v. Fisher, supra.*

Concerning the further question and first assignment by the appellant of error on the part of the chancellor below in holding under the factual situation presented that the busses operated by appellees were of a class not subject to the jurisdiction of the Illinois Commerce Commission under the provisions of the Illinois Utilities Act, the statute (sec. 55a, par. 57, Public Utilities Act, ch. 111⅔, Ill. Rev. Stat. 1943 [Jones Ill. Stats. Ann. 112.077]) relating to the operation of motor vehicles "along or upon any public street or highway in this state" applies to the "carriage of passengers for hire, indiscriminately accepting and discharging such persons as may offer themselves for transportation, along the course on which such vehicle is operated. . . ." One of the recognized tests to be applied to the prevailing facts is whether or not the carrier serves all of the public alike, who apply to him for carriage. This distinction is thoroughly discussed in the case of *Rathbun v. Ocean Acc. & Guar. Corp., Ltd., supra,* and the authorities cited therein. In the case of *Austin Bros. Transfer Co. v. Bloom,* 316 Ill. 435, 147 N. E. 387 a discussion of the distinction between private carriers and public or common carriers and what constitutes a public utility is set forth in succinct language. There, the question of whether or not a taxicab operator could lawfully furnish service to all members of the public who applied along a fixed route between Centralia and Sandoval, Illinois, in competition with a duly certified company, without first having procured a Certificate of Convenience and Necessity from the Illinois Commerce Commission, was before the court. It was there said, in paraphrasing part of the language of the applicable statute before the court, that "The term 'public utility' includes every person who now or hereafter may own, control, operate or manage within the State, directly or indirectly for public use, any plant, equipment or property used or to be used for or in connection with the trans-

portation of persons between points within the State,'' citing section 10 of the Public Utilities Act, *supra,* and the case of *State Public Utilities Commission v. Bartonville Bus Line,* 290 Ill. 574, 125 N. E. 373. It is further said that ''The question whether a person, company or corporation is owning, operating or controlling a public utility is one that necessarily depends upon the special facts connected with the management, operation or control of such business. (*Public Utilities Com. v. Noble,* 275 Ill. 121.) Whether a given business or industry is a public utility depends upon the public character of the business or service rendered, which makes its regulation a matter of public consequence and concern because it affects the whole community. (*Public Utilities Com. v. Monarch Refrigerating Co.,* 267 Ill. 528).'' Concerning private and common carriers, it is there said that ''Private carriers, as ordinarily defined, are those who, without being engaged in such business as a public employment, undertake to deliver goods or passengers for hire or reward. A common carrier of passengers has been defined as one who undertakes for hire to carry all persons indifferently who may apply for passage so long as there is room and there is no legal excuse for refusal, and accordingly jitney bus proprietors, owners of stage coaches, hacks and omnibuses have generally been held to be common carriers. This is so because in their business they serve all the public alike who apply to them for carriage, so long as they have room, and they are held common carriers regardless of the fact whether they operate in cities or from town to town or from city to city, so long as they maintain their status as public carriers, carrying all who apply and refusing none unless they have no room or for some other legal reason may refuse. (*Rathbun v. Ocean Accident Corp.,* 299 Ill. 562.)''

Plaintiff cites in support of its contention the case of *South Suburban Motor Coach Co. v. Levin,* 269 Ill.

App. 323. There, the busses in question were driven up to the curb in front of the Sherman Hotel in Chicago. Defendant would stand upon the sidewalk and sell tickets to anyone who might desire to become a passenger to and from a dog race track and occasionally the defendant would also pick up passengers enroute to the track. Tickets were kept on sale by a ticket agent in the hotel and the service was publicly announced in the hotel lobby. The nature of this service to the public in general in competition with an existing public utility was therefore held to place the defendant in that class of cases wherein a complainant operator of a public utility is entitled to a decree enjoining the individual who, without authority of law, operates a similar utility which competes with and injures his business. The court, at page 333, stated that "We are not unaware that in order that the property owned by a person should be affected by a public use all persons must have an equal right to the service (*State Public Utilities Commission v. Noble*, 275 Ill. 121) and that it is the right of public use rather than the extent to which an instrumentality is in effective use that determines whether or not it is a public utility. However, the uncontradicted evidence shows that the public without any particular discrimination was invited to avail itself of the service provided by defendant and that the contracts for carrying these persons were not in any sense private contracts. We hold that defendant in operating his business acted as a public carrier and is therefore subject to the laws and rules regulating and governing such instrumentalities." The case of *Austin Bros. Transfer Co. v. Bloom, supra,* is then cited in support of the court's conclusion. We think the distinction between that class of cases and the instant case is clear. Here, the service was not offered to the public indiscriminately nor did they pick up all passengers who applied at any terminal point or along the route but confined this service to the indi-

vidual employees with whom specific arrangements were made for going to and from their places of employment at certain stated hours when such individual's service was required; thus acting, under the particular facts and circumstances disclosed herein as this court and the chancellor below viewed them, as a private carrier and neither as a common carrier nor as a public utility requiring a Certificate of Convenience and Necessity from the State Commerce Commission. The type of school busses as used herein by the defendants bore inscriptions indicating their traffic restrictions and were similar in make and service to those in general use throughout the State in transporting groups of students from their homes to the various schools, and to a considerable extent in general use by groups of workers under the present emergency which exists on account of the World War in which we are now engaged and in the furtherance of which unusual and extraordinary demands for service by private carriers, as well as increased and unprecedented demands upon all public carriers has arisen.

The contractual arrangements of the defendants as such private carriers, although providing for definite starting and stopping points, rates and times of furnishing such restricted transportation to its individual contract patrons and not "indiscriminately" as expressly provided in the language of the Public Utilities Act cited, *supra*, did not render the defendants subject to the jurisdiction of the Commerce Commission as public utilities or otherwise, and the Commerce Commission, in so ruling and so advising the defendants, properly held under the circumstances detailed in their opinion and likewise appearing in the evidence and so found by the chancellor below, that the defendants were not operating under their jurisdiction nor required to procure Certificates of Convenience and Necessity.

While those who have procured Certificates of Convenience and Necessity as public utilities and common

carriers upon the streets and highways of this State are entitled to protection and redress against unlawful competition, it is equally true that private carriers who operate by special contractual arrangements in serving individual patrons under circumstances which do not require the procurement of such Certificate of Convenience and Necessity are entitled to like protection in the exercise and enjoyment of their lawful rights and privileges and are equally entitled to recover damages sustained as a proximate result of the unlawful invasion of and interference with the exercise of such lawful rights.

To the further contention of the appellant Company that the court erred in allowing solicitors' fees to the defendants for services performed in procuring the dissolution of the temporary injunction, it need only be said that although the first motion in the nature of a demurrer to dissolve the temporary injunction was denied and the necessity for factual proof arose under the answers which required reference of the case to the master in chancery, followed by a second motion to dissolve the temporary order based upon due proof of such facts, does not preclude the court, in the exercise of its sound discretion, from allowing reasonable solicitors' fees to the defendants for services actually rendered in procuring the dissolution of the temporary order which prevented the defendants from continuing the lawful pursuit of their business until the case was finally disposed of, nor upon suggestion of damages by the defendants which required a reference to the master for factual proof in relation thereto, followed by the allowance of damages shown to have been sustained by thus preventing the operation of the defendants' business during the forty-two day period that the temporary restraining order continued in force. Much testimony was heard before the master and court in relation thereto and the question of the propriety of allowing damages to the defendants under the evidence, together with reasonable solicitors' fees, in the

procurement of the dissolution of the temporary restraining order, appear to this court to have been properly submitted to the chancellor below. Under the facts in evidence, without specifically reciting or analyzing the same, it appears to this court that the allowance of damages and the amount so allowed were amply sustained by legal and competent evidence and were properly allowed by the court. We further find and hold that the allowance to the defendants of reasonable solicitors' fees after evidence heard in relation thereto and the order fixing the same by the court was both proper and reasonable and that the chancellor committed no error therein.

Finding no reversible error in the record, the decretal orders of the circuit court of Tazewell county will be affirmed.

*Affirmed.*